ROY J. BOSTON, by next friend, *vs.* SAMUEL BUFFUM, and others.

York.    Opinion December 29, 1902.

*Negligence. Machinery. Printing-press. Shafting. Steam Engine. Overloading Power. Contributory Negligence. New Trial.*

A proposition which, if not mechanically impossible, is exceedingly improbable, should not be permitted to serve as the basis for the verdict of a jury.

Where a verdict is so manifestly wrong as to induce a belief that it was the product of misapprehension, bias or prejudice on the part of the jury, it should be set aside.

Plaintiff was operating a printing-press supplied with power by the same engine which operated the other machinery in defendants' box factory, printing strips of board for box covers. The lower jaw of the press falling after an impression made, it was the duty of the plaintiff to remove the printed strip from the platen with his right hand, and with his left during the upward movement, to put a new strip in place to be printed. He tes-

tifies that in the instance in controversy the press opened more slowly than usual and closed more quickly and did not give him time to take his hand out before it was caught, but testified to no jump and used no similar graphic word to suggest any such sudden motion of the lower jaw of the press as the word "jump" does. It is self-evident, and the previous action of the press under similar variations of the load on the shaft as described by the other witnesses, and the plaintiff himself, showed that the first effect of a sudden quickening in speed of the shaft would only be to cause the belt to slip and then to gradually accelerate the speed of the press.

*Held;* that a theory, that at the time when plaintiff was feeding the press its lower jaw gave a sudden jump, caused by a rapid increase in the speed of the main power shaft of the factory, and caught the fingers of plaintiff's left hand between the frame-work of the platen and the die before he could, by the exercise of due care, discover the danger and remove his hand, is not well founded.

Motion by defendant.    New trial granted.

Case for injuries to the fingers of plaintiff's left hand which were crushed between the frame-work of the platen and the die plate of a printing-press in defendants' box factory, in North Berwick.    Plaintiff's declaration was as follows:—

"In a plea of the case, for that the said plaintiff says the defendants are the owners of a box factory situated in said North Berwick and operated the same, on the ninth day of August, A. D. 1900; that the said plaintiff was employed by said defendants to work in their said box factory at a printing-press; that said plaintiff's duties consisted in feeding said press with the materials to be printed; that said printing-press was run by force transmitted by machinery connected with an engine which was used to furnish the motor power for said box factory; that it was the duty of said defendants to furnish said plaintiff with proper, safe, and suitable machinery and implements to work; that said defendants, wholly regardless of this duty, negligently and carelessly furnished this mill or box factory with an improper, dangerous, inadequate and defective engine, which furnished the motor power that run said printing-press; that by reason of said defendants' negligence and carelessness in furnishing said defective engine as aforesaid, said printing-press worked and run in an irregular, defective and dangerous manner, and opened and closed at irregular and deceptive intervals; and while said plaintiff was engaged in the work for which

he was employed by said defendants at said printing-press, and while he was in the exercise of due care and diligence, on the ninth day of August, A. D. 1900, at said box factory in said North Berwick said plaintiff's left hand was caught in said printing-press and crushed, the bones of said hand and wrist fractured and displaced, and said hand was seriously and permanently injured, and the plaintiff has thereby been prevented from doing any labor or using said hand; has been put to great expense for medicine and medical attendance, and has suffered great distress of mind and body, to the damage etc."

The defense was the general issue with a brief statement in effect alleging knowledge and assumption of the risk by the defendant, also contributory negligence.

The facts are stated in the opinion.

*E. P. Spinney,* for plaintiff.

In an employment like this it is absolutely necessary that the press close regularly; for the work is rapid, requiring great attention, and because the operator must naturally acquire a personal automatic motion in order to feed the press, and any sudden variation of the motion of the press would deceive the operator and thereby cause him injury. And this automatic motion of the operator and the deception a change of speed would cause, is admitted by the defendants' foreman.

The plaintiff says he was under these conditions in the exercise of due care and not guilty of any contributory negligence, because he did not know the press would jump, and so have the jury said by their verdict.

What is ordinary care, due care and diligence, and contributory negligence under the circumstances of the case, are not matters of law, but wholly for the jury where there is evidence produced. 16 Am. & Eng. Encly. of Law, 465, and cases cited: *Watson* v. *Portland & Cape Elizabeth Railway Co.,* 91 Maine, 584, 67 Am. St. Rep. 268, 44 L. R. A. 157; *Eagan* v. *Fitchburg Railroad Co.,* 101 Mass. 315, 317; *Garmon* v. *Bangor,* 38 Maine, 443; *Hooper* v. *Boston & Maine Railroad,* 81 Maine, 260; *Plummer* v. *Eastern Railroad Co.,* 73 Maine, 591, 592.

The defendant should have provided suitable machinery and kept the same in a safe condition, as employers are required by law to do, and should not have taxed the same beyond its capacity. *Buzzell* v. *Laconia Manufacturing Co.*, 48 Maine, 113, 77 Am. Dec. 212.

The damages are not excessive. *Verrill* v. *Minot*, 31 Maine, 299; *Mason* v. *Ellsworth*, 32 Maine, 271; *Blackman* v. *Proprietors of Gardiner and Pittston Bridge*, 75 Maine, 214.

The following verdicts for injuries to hand and loss of fingers were held not excessive,— "disability of fingers, $4500," *Bolden* v. *Jensen*, 70 Fed. Rep. 505; "3 fingers, $2400," *Savannah R. R. Co.* v. *Howard*, 91 Ga. 99; " 2 fingers, $2500.", *Campbell* v. *McCay*, 3 Tex. 298; "3 fingers, $3000," *Neilson* v. *Marinette & M. Paper Co.*, 75 Wis. 579; "3 fingers, $4000," *Barg* v. *Bansfield*, 65 Minn. 355; "4 fingers, $7500," *Lake Shore R. Co.* v. *Hundt*, 41 Ill. App. 200.

In *Hastings* v. *Stetson*, 91 Maine, 229, 233, the court says: "In estimating damages for such injury much must be left to the sound judgment of the jury. Their judgment is entitled to respect."

Counsel also cited: *Frye* v. *Bath Gas & Electric Co.*, 94 Maine, 17, 18; *Allen* v. *Boston & Maine Railroad*, 94 Maine, 402; *Williams* v. *Gilman*, 3 Maine, 276; *Hunter* v. *Heath*, 67 Maine, 507; *Smith* v. *Brunswick*, 80 Maine, 189, 192; *Bernard* v. *Merrill*, 91 Maine, 358; *Tower* v. *Haslam*, 84 Maine, 86; *Dodge* v. *Dodge*, 86 Maine, 393; *Dutch* v. *Bodwell Granite Co.*, 94 Maine, 34; *Rhoades* v. *Varney*, 91 Maine, 222, 226; *Parks* v. *Libby*, 92 Maine, 133.

*H. B. Cleaves and S. C. Perry*; *B. F. Cleaves, H. T. Waterhouse and G. L. Emery*, for defendant.

SITTING: WISWELL, C. J., STROUT, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

SAVAGE, J. Action for personal injuries. The defendants were the owners and operators of a box factory in North Berwick. In the factory were two resaws, a planer, a groover, a cutting off bench, a nailing machine, a printing-press, and other machines, all belted to a single main shaft overhead. Power was supplied by an engine of

25 horse-power, which was connected with the main shaft by a single belt. The governor upon the engine was adjusted to a maximum or normal speed of 185 revolutions a minute. The printing-press, concerning which this controversy has arisen, was the Prouty press so-called. The die, or type, was placed in a nearly perpendicular position. The platen, upon which matter to be printed was placed, was fastened to a yoke, and constituted what some of the witnesses called the "lower jaw" of the press. The platen and yoke were so adjusted to the frame-work of the press that in operation they moved with a hinge-like movement, the hinge being at the bottom of the die. The outer edge of the platen, that is, the edge nearest to the operator who stood in front of the press, moved upwards, carrying the matter to be printed until it was impressed evenly against the die. Then the jaw opened and the platen and yoke went back towards a horizontal position. When closed, the frame-work of the platen was within three-eighths of an inch of the die. In opening or closing, the outer edge of the platen passed through a distance of eighteen inches. There were guards on the platen to keep in place the matter to be printed, and they were so situated that the operator in feeding the press would necessarily extend his hand into the jaw, about to the wrist. The belt connecting the printing-press with the main shaft was an inch and a half wide. The pulley on the main shaft was six inches in diameter, and the one on the press was twelve inches. The latter pulley was double, consisting of a loose pulley two inches in width, and a fast pulley of the same width. The press was started by shipping the belt from the loose pulley to the fast one. The exact weight of the platen and yoke is not known, but it was estimated, and we think fairly, at about 200 pounds. This weight, turning upon the hinge, had to be lifted by mechanical power for each impression. Its own weight helped to carry it back. Attached to the press was a balance wheel, forty inches in diameter, with a solid iron rim three inches across the face and four inches deep. The rim was supported by seven or eight solid iron spokes, each an inch in diameter. The weight of the balance wheel was fairly estimated, we think, at about 150 pounds. The balance wheel was upon the same shaft as the press pulley was, and consequently was turned with the

pulley. Ordinarily the press made about twenty impressions a minute. The plaintiff testified that it was twenty-two, and the defendant, that it was seventeen. But approximately, it took three seconds for the jaws of the press to open and close.

The plaintiff had been employed in the defendants' factory for a year and a half, and at the time of his injury was tending the press, and had been doing so for much of the time for six months. He was printing upon strips of board prepared for box covers. The strips were five and three-quarters inches long, three and three-quarters inches wide, and three-sixteenths of an inch thick. While the lower jaw of the press was falling, after an impression had been made, it was the duty of the plaintiff to remove the printed slip from the platen with his right hand, and with his left hand to place a slip to be printed, upon the platen, during its upward movement, and before it reached the point of impression.

The plaintiff, in argument, claims that while so placing a slip upon the platen, it made a sudden jump, owing to an acceleration of the speed of the main shaft, and that the fingers of his left hand were caught between the frame-work of the platen and the frame-work of the die, three-eighths of an inch apart, and severely injured. He claims that the speed of the revolutions of the main shaft was irregular, and that in this instance it suddenly increased, with the effect of making the lower jaw of the press *jump*. His testimony was that the press opened more slowly than usual, and closed more quickly, and did not give him time to take his hand out of the press before it was caught. He used no language as graphic or significant as the word "jump" is. And he attributes this sudden acceleration of speed to the fact that the engine was not possessed of sufficient power to carry evenly the load which was placed upon it. He says that on many occasions, while working on other machines, he had noticed variations in the speed of the shaft, or in the machines which took their power from the shaft, but that once and only once he had noticed a variation in the speed of the press itself. He does not characterize that variation as a "jump." Nothing in the case has any tendency to show that there was any fault in the engine and

machinery or their operation, except that the engine was too small for the load put upon it.

It is both proved and admitted that the engine was overloaded; that when all the machines were running, the speed of the engine was retarded below the normal speed fixed by its governor; and that when one or more machines ceased to run, and their load was taken off, the speed of the engine was thereby accelerated. And it is shown that this happened frequently, if not daily. But the defendants claim that this acceleration was gradual, and not sudden, like a jump; that the increase in speed was controlled in part by the governor upon the engine; and that particularly as to the press, its variations in speed were so regulated by the balance wheel as to make it mechanically impossible, belted as it was to the main shaft with a belt only an inch and a half wide, for the jaw of the press to make a sudden jump. It is claimed that the inertia of the balance wheels would so far resist a sudden acceleration of speed in the shaft as to cause the belt to slip momentarily upon the pulley, and that the quickening of the speed of the jaw would be gradual and not sudden. And the defendants contend that such an acceleration of speed would be noticeable to an operator who was duly careful, and that, in any event, it would be no greater acceleration than should have been anticipated by an operator of the age, intelligence and experience of the plaintiff, who knew of the frequent variations in the speed of the machinery; that the danger was obvious and appreciable, and hence that the risk was assumed by the plaintiff, under the rules of law governing the relation of master and servant.

And the bite of the chief contention between the parties in this case is whether, on the one hand, upon the plaintiff's testimony that the jaw "opened slowly and closed quickly," its speed was increased so suddenly and so greatly, like a jump, that the plaintiff could not reasonably have anticipated it, or have seen it, and so avoided the consequences, or whether, on the other hand, the acceleration of speed necessarily was gradual, and no greater than should have been anticipated by the plaintiff, with his knowledge of previous variations in shaft and press, and no greater than would have been noticeable to an attentive operator, with his eyes and his mind upon his work and the

press. For the defendants say, in this connection, that the injury to the plaintiff was due to his own careless inattention, which has been said to be the very essence of negligence. *Tasker* v. *Farmingdale,* 85 Maine, 524.

It is evident that the plaintiff's employment was one attended with danger. The general danger was obvious, and, without doubt appreciable by the plaintiff. To feed the press, moving normally, without endangering the hand of the plaintiff, required constant attention and watchfulness on his part. This is so, even if long continued work at the press had made the movements of his arm and hand more or less automatic, as he claims. And it is all the more his duty to be watchful, if he knew, as he says he did, that the speed of the engine was irregular. For if he knew that, he must have known also that an irregularity in the speed of the engine tended to create an irregularity in the speed with which the lower jaw of the press rose to meet the die.

There is no evidence that at the time of the accident any load was taken off the engine. It is only presumed. But we think that if there were any acceleration in the speed of the press, it might fairly be inferred, under the circumstances, that it was due to a lessening of the load of the overloaded engine. This would account for the quickening of speed testified to by the plaintiff, though we are unable to see how it can account for the change in the prior downward movement of the jaw, which the plaintiff says was slower than usual.

The defendants, as already stated, claim that the action of the governor upon the engine had a tendency to prevent a sudden increase of speed like a jump. But we are not satisfied that this would be so when the engine was overloaded. In such case the load, and not the governor, holds back the engine, and keeps its speed below the normal rate. If, however, the load is taken off, the engine increases its speed, the governor thereby is made to revolve more rapidly, and the centrifugal force tends to extend its arms towards a horizontal line. The mechanical effect of this movement is to shut off steam as the speed nearly approaches the maximum, and thereby prevent the speed exceeding the maximum. Now if at the time the load is taken off the engine, the speed is so near the maximum point that any fur-

ther increase would have the effect at the same time of shutting off steam by the governor, the governor may prevent a sudden jump. But we think if the speed was much below the maximum, the governor would not at once have any material effect in retarding speed.

We must, therefore, examine another claim of the defendants, namely, that the balance wheel on the press would itself prevent a sudden jump in the speed of that machine. The object of a balance wheel, of course, is to balance or regulate the speed of the machine, and to steady its movements. When the yoke and platen of this press were being raised to make an impression, their weight constituted a load to be lifted. That weight would have a tendency to retard the press. During the falling movement of the platen and yoke, the press, without a balance wheel, would recover its speed. There would, therefore, be a constant tendency towards an irregularity, an unevenness, in speed. The balance wheel is designed in part to overcome this unevenness. Its rapid revolutions, three for each printed impression, in this case, created a momentum which helped to carry the load up evenly, and also tended to prevent a quickening in speed while the platen and yoke were falling. It carried the machine over the bunches, so to speak. But a balance wheel regulates the movements of a machine not only as against uneven loads, but as against uneven power. Its momentum tends to carry the machine along evenly if the power slackens momentarily, and likewise its inertia resists and tends to retard any sudden acceleration of speed.

It appears clearly in this case that the inch and half belt running on the press pulley, unless very tight, would not lift the platen and yoke when lying down, without the aid of the momentum of the balance wheel. When the machine was at rest, the belt, unaided, would slip upon the upper or six inch pulley. To start the press, the operator had to start the balance wheel with his hand.

Now, under these conditions, the question is whether the jury were justified by any reasonable inference in finding that any acceleration of speed in the engine and main shaft could be transmitted by that belt to that press, and so overcome the inertia of that balance wheel as to give the platen and yoke a jump, such as the plaintiff

now complains of, and at a time when the platen and yoke were being lifted. We think they were not. We think the proposition, if not mechanically impossible, is so very improbable that it should not be permitted to sustain this verdict. Under the conditions which the case discloses, it seems to us self-evident that the first effect of a sudden quickening in the speed of the main shaft would only be to cause the belt to slip, and then gradually, and probably quickly, to increase the speed of the press. To the suggestion that perhaps the jump occurred when the platen and yoke were falling or at the point of momentary rest between the downward and upward movements, and so, when they were not a load upon the power, it is only necessary to say that that is not the jump which the plaintiff claims hurt his hand, nor does it describe the movements he testified about.

Our conclusion is strengthened by the fact that although there were frequent, daily, if not hourly, variations in the speed of the overloaded engine, caused by changing the load, and although the plaintiff had worked at this press for six months whenever it was in operation, and had observed the variations in the speed produced by the engine, he does not claim that he ever saw the press vary its motion before, except on one occasion; and of the several other witnesses who had worked on the press, none, as they testify, had ever seen it vary at all.

We also find it difficult to rid ourselves of the conviction that if the plaintiff had been paying proper attention to his work, with his mind as well as with his eyes, he would not have failed to discover his hand approaching the die, more quickly perhaps, but in season to have removed it, so far as respects any acceleration of speed which has been testified to, or would have been possible under the circumstances.

We think the verdict was clearly wrong.

*Motion sustained. New trial granted.*